UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIV.ACT.NO.:

SOP ACQUISITION CORP., )
    PLAINTIFF, )
  )
v. )
  )
CAPE SOUTHPORT )
ASSOCIATES, LLC, )
    DEFENDANT. )

01-10328RGS

DOCKETED

## COMPLAINT TO VACATE ARBITRATION AWARD

Pursuant to 9 U.S.C. § 10, the Plaintiff, SOP Acquisition Corp., requests that this Honorable Court issue an Order vacating the arbitration award between the parties, for the reasons as more fully explained below.

### I. PARTIES AND JURISDICTION

1. The Plaintiff, SOP Acquisition Corp. ("SOP"), is a Massachusetts corporation with a principle place of business located at 378 Monomoscoy Road, Mashpee, Massachusetts.

2. The Defendant, Cape Southport Associates, LLC, ("CSA") is a Delaware limited liability company with a principle place of business located at 420 Lexington Avenue, Suite 2702, New York, New York, with a Massachusetts Registered Agent located at Corporate Services Co., 84 State Street, Boston, Massachusetts.

3. SOP and CSA are parties to a series of contracts pertaining to the financing, purchase, development and sale of a condominium complex in Mashpee,

Massachusetts, known as "Southport on Cape Cod."

4. This Court has subject matter jurisdiction over the claims herein pursuant to 28 U.S.C. § 1331 in that the matter is subject to judicial review pursuant to 9 U.S.C. § 10, and 28 U.S.C. § 1332 in that the matter in controversy is in excess of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

5. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a) in that the defendant resides in this judicial district and substantial part of the events or omissions giving rise to the claim occurred within this district.

## II. FACTUAL SETTING[1]

6. On or about December 23, 1997, SOP entered into a series of agreements with CSA regarding the financing, purchase, development and marketing of a Cape Cod condominium community known as Southport on Cape Cod.

7. These agreements obligated SOP's principals, Robert Bradley, Ron Bonvie and Al Paglia to form three separate corporations for the purpose of entering into a Construction Management Agreement, Marketing Agreement, and Option Agreement. Thus, pursuant to CSA's demands, Bradley, Bonvie and Paglia established SOP, a bankruptcy remote entity to hold the option, DJG Corp., to provide construction management services, and JMG Marketing Corp., to provide marketing services.

8. Specifically, the language of the Option Agreement provided:

---

[1] Attached hereto as Exhibit 1, and incorporated herein, is SOP's Amended and More Definite Statement of Claim, with supporting exhibits, which is attached hereto and incorporated herein as Exhibit 2, which sets forth, in detail, the facts underlying this dispute. For the purposes of brevity, SOP's provides a short, summary statement of the facts in the body of the complaint. See Fed.R.Civ.Pro. 8(a).

2

"Pursuant to a Purchase & Sale Agreement dated July 1, 1997 between South Mortgage Limited Partnership as "Seller" and Lifestyles Development Corporation as "Buyer", as amended by amendments dated October 7, October 28, and December 10, 1997 (as so amended, the "Acquisition Agreement"), the Buyer's interest in which was assigned by Lifestyles Development LLC, successor to the originally named buyer, to Cape Southport Associates, LLC, a Delaware limited liability company ("Optionor"), Optionor is this day acquiring fee title to the Property from Seller. Concurrently therewith, Optionor is entering into (i) a Construction Management Agreement (the "CM Agreement") with DJG Construction Corp., a Massachusetts corporation (the "CM"), and (ii) a Marketing Agreement (the "Marketing Agreement") with JMG Marketing Corp., a Massachusetts corporation ("Marketing Manager"), for the purpose of developing, constructing, and marketing condominium units (the "Units") on the property and the development, construction, and/or rehabilitation of ancillary facilities. It is contemplated that "Phase I" of such development will encompass the development of 109 Units and related facilities and, if Optionor elects to expand the scope of the project, the development of an additional 34 Units (the "Expansion Units") and related facilities.

In consideration for the assignment of the Buyer's interest in the Acquisition Agreement to Optionor, and the agreements of the CM and the Marketing Manager to enter into the CM Agreement and the Marketing Agreement, respectively, with Optionor, it was agreed that this agreement ("Agreement") would be entered into by the parties hereto."

9. Thereafter, CSA breached its obligations as specified in the Construction Management Agreement. As set forth in SOP's Amended Statement of Claim, the construction contractor wrote to CSA with notice of CSA's default relative to the following matters:

   a. Article 10 of the Construction Contract provided that Cape Southport fund the amount of $235,000.00 for initial expenses on December 23, 1998. As of the date of the letter, only $50,000.00 had been funded.

   b. Article 10 of the Construction Contract and Paragraph 5.3 of the General Conditions required that all work, subcontracts or other appropriate agreements be made with the Contractor. Cape Southport interfered with the Contractor's ability to perform thereunder and denied the Contractor the benefit of said rights.

   c. Upon information and belief, Cape Southport made expenditures

        and incurred expenses without the Contractor's approval which Cape Southport intended and in fact did apply to the budget set forth in Schedule B of the Construction Contract.

    d.    Cape Southport failed to timely fund and authorize the Contractor's performance pursuant to the Construction Contract.

    e.    Cape Southport failed to establish a "dual party" checking account pursuant to Article 12 of the Construction Contract.

    f.    Cape Southport failed to engage an Architect as required by the Construction Contract.

10. Because of these breaches by CSA, by the time construction was underway at the development, the project was in jeopardy. Contractors who were willing and ready to perform services on behalf of SOP, walked off the job due to nonpayment and lack of cooperation on the part of CSA.

11. As a result of the breach of the construction management agreement by CSA, JMG Marketing Corp. was unable to properly market the housing units. The conduct of CSA in violation of its contractual obligations caused JMG to miss the seasonal sales cycle associated with Cape Cod residential real estate. In addition JMG was forced to return many sales deposits. Pursuant to the terms of its marketing agreement CSA was obligated to not take a course of conduct which adversely impacted JMG's abilities to properly market the units. The defaults of CSA as specified herein in the construction agreement did in fact adversely impact JMG's abilities to market the project.

12. CSA's conduct resulted in a continuing situation where construction schedules where so far behind the demand for units that potential sales were being lost. Again, this conduct adversely impacted JMG's abilities to market the project.

13. On March 25, 1998, the attorney for DJG wrote to CSA providing notice

pursuant to Paragraph 4.4 of the General Conditions of the contract detailing various breaches of said contract by CSA. As of July 17, 1998 these defaults were not cured by CSA. Counsel for DJG, JMG and SOP wrote counsel for CSA enclosing a memorandum dated April 10, 1998 raising concerns about CSA's performance relative to the construction management and marketing agreements and indicating that the breaches of contract identified in March of 1998 had not been cured. See Exhibit 4 (March 25, 1998 letter), Exhibit 5 (July 17, 1998 letter) and Exhibit 5A (April 10, 1998 Memorandum).

14. SOP, JMG and DJG performed their obligations pursuant to their respective contracts. However, CSA's breaches frustrated the progress of the project resulting in substantial construction delays such that many units were not completed on time.

15. As a matter of standard operating procedure conventional financers requested from SOP certain documentation relative to the construction and marketing of the project. As a result of these requests SOP requested that information from CSA.

16. CSA failed to respond to these requests and/or responded in an untimely fashion. As a direct result, SOP's efforts to obtain financing to exercise its right under the option agreement were unsuccessful. In fact, one source of financing with whom SOP had numerous discussions and understandings withdrew the project from consideration because it was unable to obtain the information which SOP had requested from CSA.

17. On or about January 31, 2000, the scheduled closing date for SOP's option to

purchase, SOP presented ready and willing to exercise its repurchase option, however, CSA either refused to consummate the transaction or was unable to do so by the virtue of the following failures of condition:

    a.    Failure to cure outstanding defaults on the construction management and marketing agreements.

    b.    Failure to demonstrate the removal of various mechanics liens on the property.

    c.    Failure to demonstrate compliance with an agreement with a local conservation commission.

    d.    Failure to demonstrate compliance with outstanding orders of condition; and

    e.    Failure to adjust the purchase price to reflect credit for CSA's portion of upgrades, status of uncompleted units, common areas and other amenities adjustments for deposits held, retainage for contractors and other failures on the part of Cape Southport.

18. As a result, SOP was unable to exercise its option and close in the same transaction and was therefore compelled to make a payment to CSA of $1,500,000.00 in order to maintain its rights to exercise the option at a later date. SOP was compelled to borrow the $1,500,000.00 at a total repayment cost of $4,500,000.00.

19. To date the purchase by SOP pursuant to its option agreement has not taken place.

### III – ARBITRATION PROCEEDINGS

20. Pursuant to the parties' agreement, SOP exercised its right to arbitrate the dispute and sought arbitration with JAMS/ENDISPUTE ("the Arbitrator"). The parties appointed the Honorable Francis P. O'Connor as Arbitrator. See Appointment of Arbitrator, a copy of which is attached hereto as Exhibit 3 and

incorporated herein.

21. On March 13, 2000, SOP filed its Statement of Claim with the Arbitrator, and thereafter, on May 4, 2000, filed its Amended and More Definite Statement of Claim. (see Exhibits 1 and 2)

22. On May 18, 2000, CSA filed its Response, a copy of which is attached hereto and incorporated herein as Exhibit 4.

23. On or about June 6, 2000, CSA filed its Motion for Summary Disposition, together with a supporting memorandum of law and exhibits, copies of which are attached hereto and incorporated herein as Exhibit 5.

24. On or about June 23, 2000, SOP filed its opposition to CSA's motion, a copy of which is attached hereto and incorporated herein as Exhibit 6. Thereafter, CSA filed its reply, a copy of which is attached hereto and incorporated herein as Exhibit 7.

25. On July 24, 2000, the Arbitrator issued his ruling on CSA's motion for summary disposition and entered judgment in CSA's favor on all of SOP's claims. A copy of the July 24, 2000, Arbitrator's Award is attached hereto and incorporated herein as Exhibit 8.

26. The Arbitrator did not hold oral argument on CSA's Motion for Summary Disposition and did not hear any oral testimony relative to SOP's claims.

27. On July 31, 2000, SOP filed its Motion to Correct Errors and Modify Arbitrator's Award, asserting that: (1) the Arbitrator impermissibly allowed CSA to retain the deposit; and, (2) the Arbitrator failed to recognize SOP's claim for breach of the implied covenant of good faith and fair dealing. A

copy of SOP's Motion to Correct Errors and Modify Arbitrator's Award is attached hereto and incorporated herein as Exhibit 9.

28. On August 2, 2000, CSA submitted its Opposition to SOP's Motion to Correct Errors and Modify Arbitrator's Award and thereafter SOP, on August 3, 2000, filed its Reply to CSA's Opposition. Attached hereto and incorporated herein as Exhibits 10 and 11 are copies of CSA's Opposition and SOP's Reply respectively.

29. On September 12, 2000, the Arbitrator issued his ruling on SOP's Motion to Correct Errors and Modify Arbitrator's Award and ruled that the Arbitrator's award was final. A copy of the Arbitrator's September 12, 2000, Order is attached hereto and incorporated herein as Exhibit 12.

30. The Arbitrator's September 12, 2000 Order was mailed on October 16, 2000.

31. On November 2, 2000, SOP appealed the Arbitrator's decision dated September 12, 2000 and decision dated July 24, 2000, on the grounds that the arbitrator: (1) failed to hold an evidentiary hearing relative to SOP's claim insofar as SOP's claim raised issues of material fact relative to questions of the respondent's good faith and the parties' intentions; (2) the arbitrator's ruling regarding the construction and interpretation of the applicable contracts was erroneous as a matter of law; and (3) the arbitrator's ruling awarding CSA the $1.5 million deposit was erroneous as a matter of law. A copy of the November 2, 2000, Notice of Appeal is attached hereto and incorporated herein as Exhibit 13.

32. On November 7, 2000, CSA moved to dismiss SOP's appeal. A copy of

CSA's Motion to Dismiss Appeal is attached hereto and incorporated herein as Exhibit 14.

33. On November 9, 2000, SOP responded to CSA's Motion to Dismiss. A copy of SOP's response is attached hereto and incorporated herein as Exhibit 15.

34. On November 27, 2000, the arbitrator dismissed SOP's appeal on a procedural basis without addressing the substance of the arguments raised. A copy of the arbitrator's ruling is attached hereto and incorporated herein as Exhibit 16.

35. On November 27, 2000, in accordance with the JAMS/Endispute Rules, the arbitrator's awards became "final" awards subject to judicial review. (See JAMS/Endispute Rules, a copy of which are attached hereto and incorporated herein as Exhibit 3)

## IV – BASIS FOR VACATING THE ARBITRATION AWARD

36. SOP incorporates Paragraphs 1-35 of its Complaint herein.

37. The arbitrator impermissibly refused to hear evidence relative to issues of the parties' intent and CSA's good faith, which evidence was pertinent and material to the controversy. 9 U.S.C. § 10(a)(3).

38. The arbitrator's rulings regarding the interpretation of the contracts was in manifest disregard of established law, as it failed to recognize the intent of the parties in executing the contracts.

39. The arbitrator's failure to address SOP's claim for breach of the covenant of good faith and fair dealing implied in the purchase and sale agreement constitutes a manifest disregard of established law.

40. The arbitrator's ruling that SOP did not have standing to raise claims under

9

the Construction Management Agreement and Marketing Agreement and refusal to read the contracts as an integrated series of documents, constitutes a manifest disregard of established law.

41. The arbitrator's ruling awarding CSA the $1.5 million deposit was in manifest disregard of established case law and exceeded the arbitrator's authority. 9 U.S.C. § 10(a)(3)(4).

42. The arbitrator impermissibly refused to hear evidence relative to the issue of the $1.5 million deposit. 9 U.S.C. § 10(a)(3).

WHEREFORE, the Plaintiff moves this Honorable Court to: (1) vacate the arbitrator's awards and remand this matter to JAMS/Endispute for a hearing on the merits; or, alternatively, (2) modify the award to require CSA to return the $1.5 million deposit to SOP.

Respectfully submitted,

*/s/ Joseph T. Doyle, Jr.*
Joseph T. Doyle, Jr., BBO# 133440
Matthew W. Perkins, BBO# 564868
Lecomte, Emanuelson, Motejunas & Doyle
1250 Hancock Street, Suite 815N
Quincy, MA 02169
(617) 328-1900